UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal No.: 05-410 (CKK) |
| | : | |
| v. | : | |
| | : | |
| WIDMAY DORVILIER, | : | |
|    also known as Widmayer | : | |
| | : | |
|    and | : | |
| | : | |
| JEROME JOSEPH, | : | |
|    also known as James Pierre, | : | |
| | : | |
|    Defendants. | : | |

**UNITED STATES MEMORANDUM AND
PROFFER IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits this Memorandum and Proffer in Support of Pre-Trial Detention, and states as follows:

A. INTRODUCTION

On November 16, 2005, the grand jury returned an indictment charging the defendants with violations of 18 U.S.C. § 1203, Hostage Taking of a United States citizen, and 18 U.S.C. § 924(c), Using a Firearm During a Crime of Violence, in connection with the defendants' activities abducting at gunpoint and holding for ransom a five-year old American boy between on or about October 11, 2005, and continuing thereafter to on or about October 14, 2005 in the Republic of Haiti, within the extraterritorial jurisdiction of the United States, and, pursuant to 18 U.S.C. § 3238, within the venue of the United States District Court for the District of Columbia.

The United States seeks to have the defendants held without bond pursuant to the Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3150. The United States's Motion is based

on Section 3142(f)(1)(A), and Section 3142(f)(2)(A) because two of the statutory conditions to hold a persons without bond exist in this case: the defendants committed a crime of violence and the defendants pose a serious risk of flight. Under 18 U.S.C. § 3156(a)(4), a "crime of violence" is defined as "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Clearly, the offenses here under 18 U.S.C. § 1203, Hostage Taking, and 18 U.S.C. § 924(c), Using a Firearm During a Crime of Violence, are crimes of violence. In addition, the defendants have no known ties to the District of Columbia, and nor ties to other states, while they have strong ties to their native land.

    Based upon the discussion below, the United States respectfully submits that there is no condition or combination of conditions which "will reasonably assure the appearance of the [defendants] as required and the safety of any other person and the community." Accordingly, the defendants should be detained without bail pending trial pursuant to 18 U.S.C. § 3142(e)-(f).

    As a preliminary matter, and as this Court is well aware, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. §3142(f). The United States and the defendant may proceed by way of "proffer or otherwise," id., and hearsay is permitted. E.g., United States v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986). Moreover, at a detention hearing, the United States is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." United States v. Martir, 782 F.2d

1141, 1145 (2d Cir. 1986). "The defendant may not use a pretrial detention hearing as a trial on the underlying indictment or as a method for getting discovery from potential witnesses . . . . Nor may the defendant require the government to divulge its confidential sources in such a proceeding." United States v. Williams, 798 F. Supp. 34, 36 (D.D.C. 1992) (Sporkin, J.). If there is any examination, federal courts have limited that examination to the disputed issues, since the detention hearing should neither be turned into a mini-trial nor used as a subterfuge to obtain discovery. See, e.g., United States v. Suppa, 799 F.2d 115, 120 (3rd Cir. 1986). Finally, without a defense proffer that the United States's information is incorrect, the defendant is not permitted to challenge the government's evidence. United States v. Winsor, supra, 785 F.2d at 757.

In determining whether to detain the defendant, the Court shall consider the following factors: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the defendant; and (3) the defendant's character, physical and mental condition, family ties, employment history, past conduct, and criminal history. 18 U.S.C. § 3142(g). The burden of proof on the United States on the issue of flight is the "preponderance of the evidence." United States v. Vortis, 785 F.2d 327, 328-329 (D.C. Cir.), cert. denied, 479 U.S. 841 (1986). As set forth in Vortis, the law of this Circuit is clear and unambiguous on this point:

> Although appellant argues that the government should be required to establish risk of flight by clear and convincing evidence, we hold that the magistrate correctly applied the preponderance of the evidence standard. We reach this conclusion for several reasons. First, although the statute explicitly states that a finding that a person should be detained pretrial as a danger to the community must be supported by 'clear and convincing evidence,' 18 U.S.C. § 3142(f), it is silent on the burden of proof needed for a finding that a person poses a risk of flight. By

3

contrast, in the context of bail pending appeal, the statute provides for detention unless the court finds, by clear and convincing evidence, that the person is not likely to flee or pose a danger to the community. 18 U.S.C. § 3143(b). The statutory structure therefore suggests that Congress intended a different burden of proof for pretrial detention because of risk of flight than for danger to the community. The standard of proof applicable to other kinds of pretrial proceedings is the preponderance of the evidence and we find that to be the appropriate burden for establishing risk of flight. Id.

    B.    NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE THE APPEARANCE OF THESE DEFENDANTS AS REQUIRED.

(1) The Nature and Circumstances of the Offenses Committed

If called to testify about the nature and circumstances of the offenses with which the defendant's are charged, William Clauss and Kenith Jett, Special Agents of the Federal Bureau of Investigation ("FBI"), would testify to the following facts involved in this case: On or about October 11, 2005, at approximately 5 p.m., the hostage-takers, with guns drawn, accosted the five-year old boy and his father as they were about to leave the school where the father worked in Port au Prince, Haiti. The little boy is five years old and is a citizen of the United States, having been born in Jacksonville, Florida in 2000.

Just as the father was preparing to get into his car to drive home with the child, three men, each armed with a gun, accosted them. One of these men was defendant JEROME JOSEPH, AKA JAMES PIERRE [*hereinafter* JOSEPH/PIERRE] and another was WIDMAY DORVILIER [*hereinafter* DORVILIER]. The men threw the father into the back seat and the men climbed into the car. One of the men got into the driver's seat and drove away. After driving a short distance, they stopped the car to pick up a fourth individual, who got into the car

with them. They drove awhile and then stopped the vehicle and ejected the father from the car. Before pushing the father out of the car, they stole from him some money, a cell phone, and some jewelry. The hostage-takers instructed the father to telephone them later at the number of the father's own cell phone, which they had just stolen from him.

The father made his way back to his place of employment and told several people what had just happened. At that time he did not report the kidnaping to the police for fear that reporting the incident to the police might result in retaliation or harm to his son.

At about 7 p.m. that night, the father telephoned the hostage takers. They told him to relax and that they would call him back later. At about 9 p.m., the hostage takers called back. One of the hostage takers told the father that if he wanted to get his son back, he would have to give them 300,000 "green ones," which the father took to mean United States dollars. They also said that if the father did not do that, they would bring the disembodied head of the son to the father in the morning. The father expressed to the hostage takers that he did not have a way to get that amount of money, and certainly not in that time frame. The hostage takers again stated their demand and hung up the phone.

Some of the colleagues and friends of the father who knew of the situation had notified the police. On the next day, Wednesday, October 12, the day after the kidnaping, at about 6 a.m., the hostage takers again telephoned the father and told him to "go get the money" and then hung up. At 8 a.m., they telephoned again to ask "what happened to the money." The father informed them that he could only come up with approximately $1,875 U.S. dollars ("USD"). They instructed him to find more money. That same day, some friends of the father, knowing that the

5

child was a United States citizen, reported the incident to the United States Embassy in Port au Prince, Haiti.

Over the next hours of Wednesday, October 12, the father received more calls demanding ransom from the hostage takers. They again threatened to kill the boy. The father tried to persuade them to lower their demands, but they would not budge. By 8 p.m., the father had managed to raise more money, approximately USD $ 2,800. The hostage takers again threatened to kill the child if USD $300,000 was not paid. The threatening calls continued through Wednesday night and into Thursday, October 13.

On the morning of Thursday, October 13, the hostage takers spoke with the father by telephone again. This time they threatened to cut the boy into pieces and return him to the father in a bag unless the money was paid. They did not specify exactly when they would do this.

At about 2 p.m. that same day, Thursday, the hostage takers telephoned the father again. They informed him that the boy was not doing well, was crying often, and begging for his father. The father told them that he could pay approximately USD $3,750 but that he wanted some proof that his son was still alive before he paid the money. The hostage takers hung up the phone. Around 5 p.m., they called back and again asked the father where the money was. That evening, Thursday, the father went to a location he had arranged with the hostage takers to pay them the money he had managed to raise. The father went to the place and handed an envelope with the money to a black male who was one of the original kidnappers.

The following day, Friday, October 14, the hostage takers again contacted the father about the payment of the ransom money. The father told them he had already given them all he had but that he would call some friends in the United States to see if they would wire him some money.

The hostage takers asked if the father really believed that he could get money from the United States. The father said that he was going to try, but first wanted to talk to the boy to make sure he was still alive. The hostage takers agree to put the boy on the phone in about one hour during the next call, which they did. The father spoke to the boy briefly. The father told the hostage takers to call him back at approximately 2 p.m. that day.

Later the same day, at approximately 1 p.m., the police in Haiti received information from a citizen on where the hostage takers were holding the boy. They proceeded to that location and found the boy. With the boy was an adult male. The boy was playing in a yard in front of a house. The adult male was sitting on the front porch watching him and was the only adult at the house. When the police arrived, the adult male fled into the house and hid under the bed. Police rescued the child and took that adult male into custody.

Apparently, not yet having learned that the child had been rescued, the other hostage takers continued their demands of the father for more money. Earlier in the day the father had told them that he would try to raise additional money for ransom from contacts in the United States. Just as the father was driving to the police station to be reunited with his son, he received another demand call from the hostage takers. Police advised the father to tell them that he had the money and that he would meet them to hand it over. The father told the hostage takers that he had USD $5,000 and that he would pay at the same location as the day before.

The father went to the payoff location, where police had set up surveillance. The father was driving a friend's vehicle. Defendant JOSEPH/PIERRE, one of the original kidnapers, came up to the father and accepted an envelope. DORVILIER accompanied JOSEPH/PIERRE. Police

moved in and were able to take JOSEPH/PIERRE into custody, but DORVILIER fled and eluded police. The father recognized the other person as being one of the original carjackers/ kidnapers.

JOSEPH/PIERRE was searched upon his arrest and found to be in possession of a loaded 9 mm handgun. The FBI is in possession of the gun and ammunition.

After his arrest, the FBI interviewed JOSEPH/PIERRE on two different dates, October 14 and November 10, 2005. At the start of both interviews, the FBI informed JOSEPH/PIERRE of his rights in his native language, which he waived both times. JOSEPH/PIERRE identified himself as James Pierre. JOSEPH/PIERRE gave a statement confessing to his participation in the hostage-taking. He also implicated his coconspirators, one of whom was in charge of the conspiracy, "WIDMAYER," AKA WIDMAY DORVILIER, another who was the adult male who was holding the child, and two other individuals, one of whom had access to inside information about the father's activities, and another male, who was an active participant in the initial carjacking. While at the police station, JOSEPH/PIERRE was in a position to see the adult male who was holding the child and told the FBI that he was one of the kidnapers. JOSEPH/PIERRE stated that the 9 mm. handgun he possessed upon his arrest was the same handgun he had used during the carjacking and hostage taking.

In the November 10 interview, JOSEPH/PIERRE admitted that he had given his alias as his name during the October 14 interview. JOSEPH/PIERRE again admitted to his involvement in the kidnaping and supplemented some of his earlier statements. For example, JOSEPH/PIERRE stated he had known DORVILIER for his whole life, that he is a member of DORVILIER's gang, and has committed two other kidnapings with DORVILIER's gang. JOSEPH/PIERRE was not shown a photograph of DORVILIER, but said that he recognized

DORVILIER when DORVILIER was brought to the police station. DORVILIER was arrested several days after JOSEPH/PIERRE.

The FBI interviewed WIDMAY DORVILIER on November 9, 2005 at the Haitian court's custodial facility. DORVILIER was informed of his rights in his native language, and he waived his rights and agreed to speak with the FBI. DORVILIER admitted that he had organized and participated in the kidnaping of a child with a certain nickname, the very nickname of the five-year-old boy victim. DORVILIER stated that two students from the school approached him with the idea, and claimed that they had an informant in the school. DORVILIER agreed to commit the kidnaping, and recruited JOSEPH/PIERRE and another male for the task. The students drove the three kidnapers to the school. DORVILIER then described the conduct of the kidnaping in a manner generally consistent with the description provided by the father and JOSEPH/PIERRE. DORVILIER admitted to sending two individuals to accept the first ransom payment, and then demanding more money from the father. He also admitted being present for the second payment, where JOSEPH/PIERRE was taken into custody. DORVILIER identified JOSEPH/PIERRE in a photo array.

(2) The Weight of the Evidence

As discussed above, the evidence in this case will be extraordinarily strong as to the guilt of the defendants on the hostage taking and weapons charges.

(3) The History and Characteristics of Defendants

It appears from the investigation of this case that the defendants are both nationals of Haiti and have no apparent ties to this community or even to the United States. See United States v. Townsend, 897 F.2d 989, 996 (9th Cir. 1990) (holding that defendant's failure to have

any ties to the United States is a relevant factor).  These defendants each present extraordinary risks of flight.  If given the chance to flee, given the seriousness of the charges and the weight of the evidence, these defendants could easily seek to exit the United States.  Should any of these defendants flee back to Haiti, it would be exceedingly difficult if not impossible to bring them back before the Court.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

By:_____
JEANNE M. HAUCH
Assistant United States Attorney
National Security Section
D.C. Bar #426585
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-5776

_____
THOMAS P. SWANTON
Trial Attorney
D.C. Bar No 462144
Counterterrorism Section,
  Criminal Division
U.S. Department of Justice
10th & Constitution Ave., NW
Washington, D.C.  20530
(202) 514-0636

### **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing was served by US Mail and electronically on counsel for the defendant Joseph, Tony Miles, Esq., Federal Public Defender for the District of Columbia, 625 Indiana Avenue, N.W., Suite 550, Washington, D.C. 20004, Fax: 202-208-7515, and will be transmitted to counsel for defendant Dorvilier as soon as counsel becomes known, on this ___ day of January, 2006.

                                                                     _____
                                                                      JEANNE M. HAUCH
                                                                      Assistant United States Attorney