ATTACHMENT A

STATEMENT OF THE OFFENSES
CR 05-410

**Introduction**

FILED
MAR 2 2 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The government's evidence at trial would prove beyond a reasonable doubt that on October 11, 2005, at approximately 5 p.m., JEROME JOSEPH, AKA JAMES PIERRE [hereinafter JOSEPH/PIERRE], WIDMAY DORVILIER [hereinafter DORVILIER] and another male (hereinafter "the hostage takers"), with guns drawn, accosted a five-year old boy and his father as they were about to leave the school where the father worked in Port au Prince, Haiti. The little boy is five years old and is a citizen of the United States, having been born in Florida in 2000.

Just as the father was preparing to get into his car to drive home with the child, three men accosted them in the parking lot. One of these men was defendant JOSEPH/PIERRE and another was DORVILIER. At least two of the three men were displaying guns. JOSEPH/PIERRE was armed with a loaded handgun and displayed it. The men threw the father into the back seat and the men climbed into the car. One of the men got into the driver's seat and drove away. After driving a short distance, they stopped the car to pick up a fourth individual, who got into the car with them. They drove awhile and then stopped the vehicle and ejected the father from the car. Before pushing the father out of the car, they stole from him some money, a cell phone, and some jewelry. The hostage-takers instructed the father to telephone them later at the number of the father's own cell phone, which they had just stolen from him.

The father made his way back to his place of employment and told several people what had just happened. At that time he did not report the kidnaping to the police for fear that reporting the incident to the police might result in retaliation or harm to his son.

At about 7 p.m. that night, the father telephoned the hostage takers. They told him to relax and that they would call him back later. At about 9 p.m., the hostage takers called back. One of the hostage takers told the father that if he wanted to get his son back, he would have to give them 300,000 "green ones," which the father took to mean United States dollars. They also said that if the father did not do that, they would bring the disembodied head of the son to the father in the morning. The father expressed to the hostage takers that he did not have a way to get that amount of money, and certainly not in that time frame. The hostage takers again stated their demand and hung up the phone.

-11-                                      Initials:____/____

Some of the colleagues and friends of the father who knew of the situation had notified the police. On the next day, Wednesday, October 12, the day after the kidnaping, at about 6 a.m., the hostage takers again telephoned the father and told him to "go get the money" and then hung up. At 8 a.m., they telephoned again to ask "what happened to the money." The father informed them that he could only come up with approximately $1,875 U.S. dollars ("USD"). They instructed him to find more money. That same day, some friends of the father, knowing that the child was a United States citizen, reported the incident to the United States Embassy in Port au Prince, Haiti.

Over the next hours of Wednesday, October 12, the father received more calls demanding ransom from the hostage takers. They again threatened to kill the boy. The father tried to persuade them to lower their demands, but they would not budge. By 8 p.m., the father had managed to raise more money, approximately USD $2,800. The hostage takers again threatened to kill the child if USD $300,000 was not paid. The threatening calls continued through Wednesday night and into Thursday, October 13.

On the morning of Thursday, October 13, the hostage takers spoke with the father by telephone again. This time they threatened to cut the boy into pieces and return him to the father in a bag unless the money was paid. They did not specify exactly when they would do this.

At about 2 p.m. that same day, Thursday, the hostage takers telephoned the father again. They informed him that the boy was not doing well, was crying often, and begging for his father. The father told them that he could pay approximately USD $3,750 but that he wanted some proof that his son was still alive before he paid the money. The hostage takers hung up the phone. Around 5 p.m., they called back and again asked the father where the money was. That evening, Thursday, the father went to a location he had arranged with the hostage takers to pay them the money he had managed to raise. The father went to the place and handed an envelope with the money to a black male who was one of the original kidnappers.

The following day, Friday, October 14, the hostage takers again contacted the father about the payment of the ransom money. The father told them he had already given them all he had but that he would call some friends in the United States to see if they would wire him some money. The hostage takers asked if the father really believed that he could get money from the United States. The father said that he was going to try, but first wanted to talk to the boy to make sure he was still alive. The hostage takers agree to put the boy on the phone in about one

-12-                                    Initials:____/____

hour during the next call, which they did. The father spoke to the boy briefly. The father told the hostage takers to call him back at approximately 2 p.m. that day.

Later the same day, at approximately 1 p.m., the police in Haiti received information from a citizen on where the hostage takers were holding the boy. They proceeded to that location and found the boy. With the boy was an adult male. The boy was playing in a yard in front of a house. The adult male was sitting on the front porch watching him and was the only adult at the house. When the police arrived, the adult male fled into the house and hid under the bed. Police rescued the child and took that adult male into custody.

Apparently, not yet having learned that the child had been rescued, the other hostage takers continued their demands of the father for more money. Earlier in the day the father had told them that he would try to raise additional money for ransom from contacts in the United States. Just as the father was driving to the police station to be reunited with his son, he received another demand call from the hostage takers. Police advised the father to tell them that he had the money and that he would meet them to hand it over. The father told the hostage takers that he had USD $5,000 and that he would pay at the same location as the day before.

The father went to the payoff location, where police had set up surveillance. The father was driving a friend's vehicle. Defendant JOSEPH/PIERRE, one of the original kidnapers, came up to the father and accepted an envelope. DORVILIER accompanied JOSEPH/PIERRE. Police moved in and were able to take JOSEPH/PIERRE into custody, but DORVILIER fled and eluded police.

JOSEPH/PIERRE was searched upon his arrest and found to be in possession of a loaded 9 mm handgun. The FBI is in possession of the gun and ammunition.

After his arrest, the FBI interviewed JOSEPH/PIERRE on two different dates, October 14 and November 10, 2005. At the start of both interviews, the FBI informed JOSEPH/PIERRE of his rights in his native language, which he waived both times. JOSEPH/PIERRE identified himself as James Pierre. JOSEPH/PIERRE gave a statement confessing to his participation in the hostage-taking. He also implicated his coconspirators, one of whom was in charge of the conspiracy, "WIDMAYER," AKA WIDMAY DORVILIER, another who was the adult male who was holding the child, and two other individuals, one of whom had access to inside information about the father's activities, and another male, who was an active participant in the initial carjacking. While at the police station, JOSEPH/PIERRE was in a position to see the adult

-13-                                      Initials:____/____

male who was holding the child and told the FBI that he was one of the kidnapers. JOSEPH/PIERRE stated that the 9 mm. handgun he possessed upon his arrest was the same handgun he had used during the carjacking and hostage taking.

    The FBI interviewed WIDMAY DORVILIER on November 9, 2005 at the Haitian court's custodial facility. DORVILIER was informed of his rights in his native language, and he waived his rights and agreed to speak with the FBI. DORVILIER admitted that he had organized and participated in the kidnaping of a child with a certain nickname, the very nickname of the five-year-old boy victim. DORVILIER stated that two students from the school approached him with the idea, and claimed that they had an informant in the school. DORVILIER agreed to commit the kidnaping, and recruited JOSEPH/PIERRE and another male for the task. The students drove the three kidnapers to the school. DORVILIER then described the conduct of the kidnaping in a manner generally consistent with the description provided by the father and JOSEPH/PIERRE. DORVILIER admitted to sending two individuals to accept the first ransom payment, and then demanding more money from the father. He also admitted being present for the second payment, where JOSEPH/PIERRE was taken into custody. DORVILIER identified JOSEPH/PIERRE in a photo array.

-14-                                Initials:____/____

Acknowledgment:

I have had read to me this Statement of Offenses and carefully reviewed every part of it with my attorney. I agree that it is a fair and accurate description of what happened.

3-22-06
Date

WIDMAY DORVILIER
Widmay Dorvilier, Defendant

I am defendant's attorney. I have reviewed every part of this Statement of Offenses with him.

3-22-06
Date

Joanne Vasco
Joanne Vasco, Esq.
Counsel for Defendant

-15-    Initials:____/____

ATTACHMENT B:

SENTENCING GUIDELINES CALCULATIONS FOR WIDMAY DORVILIER:

BASE OFFENSE: 18 U.S.C. § 1203(a)

| 1203(a) | Hostage taking | | |
|---|---|---|---|
| | Kidnaping, Abduction, | | |
| | Unlawful Restraint (2A4.1(a)) | BOL | 32 |
| | Ransom demand (2A4.1(b)(1)) | | 6 |
| | Minor victim placed in care of another (2A4.1(b)(6)) | | 3 |
| | TOTAL | | 41 |

Please note that while an enhancement for the use of dangerous weapon would apply under 2A4.1(b)(3), under 2K2.4 application note 4, that enhancement drops out as already accounted for by the 924(c) count.

At level 41 and criminal history category I, the range is 324-405 months. With three points deducted for acceptance of responsibility, he goes from level 41 to level 38. At level 38 and criminal history category of I, the range is 235-293 months (19 years 7 months to 24 years 5 months) for this count.

| 924(c) | Using and Carrying a Firearm During a Crime of Violence ("COV") (2K2.4) | |
|---|---|---|
| | > COV here is hostage taking | |
| | > minimum term required by statute | **7 YEARS** |
| | < maximum life | |
| | - must be consecutive to any other sentence | |

The 924(c) offense does not group for purposes of its mandatory minimum, which must by statute, be consecutive to any other sentence. See § 3D1.1(b)(1). For the 924(c), he is facing 7 years. This is in addition to the sentence noted above for the § 1203 hostage-taking offense.

-16-    Initials:____/____