UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Criminal No.:  05-410-01 (CKK) |
| | : | |
| v. | : | |
| | : | |
| **WIDMAY DORVILIER,** | : | |
| | : | |
| **Defendant.** | : | |

GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE BASED UPON
DEFENDANT'S SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT[1]

    The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits this motion pursuant to U.S.S.G. § 5K1.1.  This provision authorizes the Court, upon motion of the government, to impose a sentence below the sentence otherwise applicable under the United States Sentencing Guidelines (U.S.S.G.).  The defendant is subject to a sentencing guidelines range of 235-293 months based on his total offense level of 38, which level includes a three-point reduction for acceptance of responsibility.  He is also subject to a statutory mandatory minimum of seven years under 18 U.S.C. § 924(c), which must be consecutive to any other sentence.  The United States submits this motion based on the substantial assistance which the defendant has rendered in the investigation and prosecution of other persons.  The United States submits this motion because defendant rendered "substantial assistance" in the prosecution of his fellow conspirators and therefore is entitled to a downward sentencing departure from his sentencing guidelines range.

---

    [1] While often motions for downward departure based on substantial assistance are filed under seal, because previous proceedings in this matter have not been sealed the government does not file this motion under seal.

## I. Procedural History

On November 16, 2005, the grand jury returned an indictment charging defendants Widmay Dorvilier and Jerome Joseph with violations of 18 U.S.C. § 1203, Hostage Taking of a United States Citizen, and of 18 U.S.C. § 924(c), Use of a Firearm During a Crime of Violence, in connection with the abduction at gunpoint and holding for ransom of a five-year old American boy on October 11 and continuing thereafter to October 14, 2005 in the Republic of Haiti, within the extraterritorial jurisdiction of the United States, and, pursuant to 18 U.S.C. § 3238, within the venue of the United States District Court for the District of Columbia.

On March 10, 2006, in case 05-410-02 (CKK), Jerome Joseph pleaded guilty to one count of hostage-taking, in violation of 18 U.S.C. § 1203, with a cooperation provision. On March 22, 2006, in case 05-410-01 (CKK), Widmay Dorvilier pleaded guilty to one count of hostage-taking, in violation of 18 U.S.C. § 1203, and one count of a violation of 18 U.S.C. 924(c), with a cooperation provision.

On December 6, 2006, the grand jury indicted defendant Fanel Joseph for hostage-taking, in a related separate case concerning the same crime.  On March 9, 2007, Fanel Joseph entered a guilty plea in case 06-350-01 (CKK) to one count of hostage-taking, with a cooperation provision.

## II. The Facts

### A. Seizing the Child Hostage

In the fall of 2005, M.D. was a five-year-old American boy living with his family in Port au Prince, Haiti.  He was a citizen of the United States, having been born in Jacksonville, Florida in 2000.  On Tuesday, October 11, 2005, at approximately 5 p.m., his calm world was shattered

when three hostage-takers, with guns drawn, accosted the five-year old boy and his father in a parking lot as they were about to leave the school where the father worked in Port au Prince. One of these men was defendant Widmay Dorvilier [*hereinafter* Dorvilier] and another was defendant Jerome Joseph. The idea for the hostage taking had come from some associates of Dorvilier. Those associates claimed that the family was wealthy and could pay a large ransom. To plan the details, Dorvilier held meetings at his house, attended by Jerome Joseph, conspirator Fanel Joseph,[2] a man we shall refer to as "Conspirator J," and other conspirators. Dorvilier supplied 9 mm handguns on the day of the hostage taking.

That afternoon, October 11, 2005, Dorvilier, Jerome Joseph and a third man confronted M.D. and his father at gunpoint. The men threw the father into the back seat of the father's car. They placed little M.D. in the front. The men climbed into the car, with Dorvilier taking the wheel. After driving a short distance, they stopped the car to pick up a fourth conspirator, "Conspirator J," who got into the car with them. They drove awhile, then stopped the vehicle and ejected the father from the car. Before pushing the father out of the car, they stole from him some money, his cell phone, and some jewelry. The hostage-takers instructed the father to telephone them later at the number of the father's own cell phone, which they had just stolen from him.

The father made his way back to his place of employment in a state of shock and told several people what had just happened. At that time he did not report the kidnaping to the police for fear that reporting the incident to the police might result in retaliation or harm to his son. He

---

[2] Jerome Joseph and Fanel Joseph are not related, to the best knowledge of the government.

also could not bring himself to telephone his wife to tell her what had happened. She was visiting relatives in the United States and was expecting their second child. She was having a difficult pregnancy and he was afraid the terrible news would affect her health.

### B. The Ransom Demands

At about 7 p.m. that night, the father telephoned the hostage takers. They told him to "relax" and that they would call him back later. Dorvilier took the lead in the ransom negotiations. At about 9 p.m., the hostage takers called back. One of the hostage takers told the father that if he wanted to get his son back, he would have to give them 300,000 "green ones," which the father took to mean United States dollars. They also said that if the father did not do that, they would bring the disembodied head of the son to the father in the morning. The father expressed to the hostage takers that he did not have a way to get that amount of money, and certainly not in that time frame. The hostage takers again stated their demand and hung up the phone. Some colleagues and friends of the father who knew of the situation notified the police.

The next day, Wednesday, October 12, the day after the kidnaping, at about 6 a.m., the hostage takers again telephoned the father and told him to "go get the money" and then hung up. At 8 a.m., they telephoned again to ask "what happened to the money." The father informed them that he could only come up with approximately $1,875 U.S. dollars ("USD"). They instructed him to find more money. That same day, some friends of the father, knowing that the child was a United States citizen, reported the incident to the United States Embassy in Port au Prince, Haiti, which alerted the Federal Bureau of Investigation [*hereinafter* FBI].

Over the next hours of Wednesday, October 12, the father received more calls demanding ransom from the hostage takers. They again threatened to kill the boy. The father tried to

persuade them to lower their demands, but they would not budge. By 8 p.m., the father had managed to raise more money, approximately $ 2,800 USD. The hostage takers again threatened to kill the child if $300,000 USD was not paid. The threatening calls continued through Wednesday night and into Thursday, October 13.

On the morning of Thursday, October 13, the hostage takers spoke with the father by telephone again. This time they threatened to cut the boy into pieces and return him to the father in a bag unless the money was paid. They did not specify exactly when they would do this. By this time, the father was terrified.

At about 2 p.m. that same day, Thursday, the hostage takers telephoned the father. They informed him that the boy was not doing well, was crying often, and begging for his father. The father told them that he could pay approximately $3,750 USD but that he wanted some proof that his son was still alive before he paid the money. The hostage takers hung up the phone. Around 5 p.m., they called back and again asked the father where the money was. That evening, Thursday, the father went to a location he had arranged with the hostage takers to pay them the money he had managed to raise. The father went to the place and handed over an envelope with the money to a black male whom he believed was one of the original kidnappers.

The following day, Friday, October 14, the hostage takers again contacted the father about the payment of the ransom money. The father told them he had already given them all he had but that he would call some friends in the United States to see if they would wire him some money. The hostage takers asked if the father really believed that he could get money from the United States. The father said that he was going to try, but first wanted to talk to his son to make sure he was still alive. Little M.D. had been held hostage for more than three days.

Unbeknownst to the father, the hostage takers had taken the boy to the home of defendant Fanel Joseph, who had agreed to hold the boy there for a cut of the profits. Dorvilier and the other hostage takers agreed to put the boy on the phone in about one hour during the next call, which they did. The father spoke briefly to M.D., who was at Fanel Joseph's house with Dorvilier. Frantically scrambling for funds to save his son's life, the father told the hostage takers to call him back at approximately 2 p.m. that day.

### C. The Rescue of the Child and the Arrests of the Hostage Takers

The same day, Friday, at approximately 1 p.m., the police in Haiti received information from a citizen on where the hostage takers were holding the boy, little M.D. They proceeded to that location and found M.D. With M.D. was Fanel Joseph, who was the only adult at the house. M.D. was playing in the front yard. Fanel Joseph was sitting on the front porch watching him. When the police arrived, Fanel Joseph fled into the house and hid under the bed. Police rescued little M.D. and took Fanel Joseph into custody.

Apparently not yet having learned that the boy had been rescued, the other hostage takers continued their ransom demands of the father for more money. Earlier in the day the father had told them that he would try to raise additional money for ransom from contacts in the United States. Just as the father was driving to the police station to be reunited with his son, he received another demand call from the hostage takers. Police advised the father to tell them that he had the money and that he would meet them to hand it over. The father told the hostage takers that he had $5,000 USD and that he would pay at the same location as the day before.

The father went to the payoff location, where police had set up surveillance. The father was driving a friend's vehicle. Defendant Jerome Joseph came up to the father and accepted the

envelope which he believed contained the ransom money. Dorvilier accompanied Jerome Joseph. Police moved in and were able to take Jerome Joseph into custody, but Dorvilier fled and eluded police. Police searched Jerome Joseph upon his arrest and found on him a loaded 9 mm handgun.

After his arrest, the FBI interviewed Jerome Joseph in Haiti on two different dates, October 14, 2005 (the day of his arrest) and November 10, 2005. At the start of both interviews, the FBI informed Jerome Joseph of his rights in his native language, which he waived both times. Jerome Joseph identified himself as "James Pierre." Jerome Joseph gave a statement confessing to his participation in the hostage-taking. He also implicated his coconspirators, one of whom was in charge of the conspiracy, Widmay Dorvilier, another who was the adult male who was holding the child, Fanel Joseph, and two other conspirators, one of whom had access to inside information about the father's activities, and another who was an active participant in the initial car jacking. Jerome Joseph stated that the 9 mm handgun he possessed upon his arrest was the same handgun he had used during the car jacking and hostage taking. While at the police station, Jerome Joseph was in a position to see Fanel Joseph and told the FBI that he was one of the conspirators.

In the November 10 interview, Jerome Joseph admitted that he had given his alias as his name during the October 14 interview. Jerome Joseph again admitted to his involvement in the kidnaping and supplemented some of his earlier statements. Jerome Joseph stated he had known Dorvilier for his whole life, that he was a member of Dorvilier's gang, and that he had committed two other kidnapings with Dorvilier's gang. Jerome Joseph was not shown a photograph of Dorvilier, but told the authorities that he recognized Dorvilier when Dorvilier was

brought to the police station.  Dorvilier was arrested several days after Jerome Joseph.

      The FBI interviewed Dorvilier on November 9, 2005 at the Haitian court's custodial facility.  Dorvilier was informed of his rights in his native language, and he waived his rights and agreed to speak with the FBI.  Dorvilier admitted that he had organized and participated in the kidnaping of a child with a certain nickname, the very nickname of the five-year-old boy victim, M.D.  Dorvilier stated that two students from the school approached him with the idea and claimed that they had an informant in the school.  Dorvilier agreed to orchestrate the kidnaping.  He recruited Jerome Joseph and several others for the task.  The students drove the three kidnapers to the school.  Dorvilier then described the kidnaping in a manner generally consistent with the description provided by the father and Jerome Joseph.  Dorvilier admitted to sending two individuals to accept the first ransom payment, and then demanding more money from the father.  He also admitted being present for the second payment, where Jerome Joseph was taken into custody.  Dorvilier identified Jerome Joseph from a photo array.

      Dorvilier further informed the FBI that he had seen Fanel Joseph in the holding facility and been housed with him.  While the two were housed together, Fanel Joseph told Dorvilier that the police had come to his house and rescued the boy.  Dorvilier later stated that Fanel Joseph had attended a planning meeting at Dorvilier's house.  On November 9, 2005, Dorvilier viewed a photo array and selected a photo of Fanel Joseph, identifying him as the one who had held the boy.

      Back on the day of his arrest, October 14, 2005, Fanel Joseph spoke with the FBI.  He denied that he had knowingly participated in the hostage-taking plot.  His story at that time was that a friend, "Conspirator J," had asked him if he would watch a child overnight and he agreed.

The next day, he said he was sitting on his porch when the police rushed up to his house. He fled inside under the bed and police arrested him. The FBI interviewed Fanel Joseph again on November 10, 2005, in jail in Haiti. He again claimed that he did not know that the child had been kidnaped. He remained in jail while Dorvilier and Jerome Joseph were prosecuted in the U.S.

On the basis of the identifications, cooperation and guilty pleas by Dorvilier and Jerome Joseph, the government indicted Fanel Joseph on December 6, 2006. On January 18, 2007, Fanel Joseph met with the FBI and consented voluntarily to go to the United States to face prosecution. The FBI interviewed Fanel Joseph on January 29, 2007, as he traveled from Miami to Washington, D.C. After he was informed of his rights in his native language and waived his rights, Fanel Joseph gave a truthful version of events. Fanel Joseph had become involved in the kidnaping through a friend, "Conspirator J," who had brought him to a meeting at Dorvilier's house in Martissant, Haiti. Conspirator J asked Fanel Joseph if he would agree to hold the boy at his house in exchange for money. Fanel Joseph agreed and did hold the boy hostage at his house. Fanel Joseph later pleaded guilty.

### III. The Roles of the Conspirators

The government has concluded that the conspirators performed the following roles in the plot. Dorvilier was a leader and organizer. The idea for the hostage taking originated with two of Dorvilier's associates who had an informant that worked at the university where the father worked. The associates told Dorvilier that the family was rich and could pay a large ransom. Dorvilier ran planning meetings at his house. He met with the two associates and subsequently with a larger group of six to seven individuals. Dorvilier was one of the armed hostage-takers

and drove the getaway car as well. Dorvilier supplied at least two guns to the hostage takers. Dorvilier made ransom demands and threatened to dismember the child if the ransom was not paid. Dorvilier went to Fanel Joseph's house to put the child on the phone for a proof of life phone call with the father. Dorvilier was able to keep approximately $500-600 of the first ransom payment, which he quickly spent. While no prior criminal convictions are known, Dorvilier admitted that he was the leader of a gang that had perpetrated other crimes, including kidnapings, robberies and shootings.

Jerome Joseph was recruited by Dorvilier and attended a planning meeting at Dorvilier's house. Jerome Joseph was one of the hostage takers. He was armed with a 9 mm handgun. Jerome Joseph received a portion of the first ransom payment. He later went with Dorvilier to pick up the second ransom payment, at which time Jerome Joseph was arrested in possession of a 9 mm handgun.

Fanel Joseph was recruited by "Conspirator J," who took him to a planning meeting at Dorvilier's house. At that time, Fanel Joseph agreed to hold the child at his house after the child was taken hostage, which he did. He received a small amount of money. The role of the elusive "Conspirator J" was to recruit Fanel Joseph to hold the child, to be the second driver of the getaway car after they kicked the father out, and then to hold the child until they could take the child over to Fanel Joseph's house. The roles of some of the other conspirators were to provide inside information and to assist Dorvilier in the kidnaping and ransom negotiations.

## IV. Victim Impact

The child victim, M.D., and his family have suffered serious psychological trauma as a result of this offense. M.D.'s parents have completed victim impact statements that are attached

hereto as Exhibits A and B.[3]

## V.  The Substantial Assistance of Defendant Widmay Dorvilier

Defendant Dorvilier was amenable to an early disposition of the charges against him and played a key role in bringing about the indictment and eventual guilty plea of Fanel Joseph.  In fact, Dorvilier was cooperative from his first contacts with law enforcement.  As noted above, Dorvilier confessed to the FBI at arrest.  Dorvilier named his fellow conspirators Jerome Joseph and Fanel Joseph.  He provided some nicknames, descriptions and addresses of other conspirators (some of whom were not known previously to law enforcement).  He provided a detailed description of the events.

Dorvilier did not attempt to contest his rendition to the FBI in Haiti.  Upon arrival in the United States, he was assigned defense counsel.  Very shortly after being provided with the facts and evidence, defense counsel indicated that her client was interested in cooperating.  Prior to plea negotiations, Dorvilier agreed to and participated in two "off-the-record" debriefings.  At that time, Dorvilier provided a very detailed account of his participation in the crime and provided all the details he could concerning his coconspirators.

On March 22, 2006, Dorvilier pleaded guilty to one count of hostage taking (in violation of §1203) and one count of carrying a firearm during a crime of violence (in violation of §924(c)), with a cooperation provision.  In the plea agreement, Dorvilier agreed to cooperate fully against his fellow conspirators, including providing testimony at trial if necessary.  He had follow-up debriefings on five occasions.  Dorvilier was candid during his debriefings and provided information that would have significantly enhanced the prosecution's case at trial, had

---

[3] These statements are redacted to protect the identity of the child victim and his family.

any of the defendants elected to go to trial.

Based on the information provided by Dorvilier (and Jerome Joseph), the government was able to indict Fanel Joseph in December, 2006, go arrest him in Haiti, and persuade him to waive extradition and face justice in Washington. On March 9, 2007, Fanel Joseph entered a guilty plea in light of the fact that Jerome Joseph and Dorvilier were prepared to testify against him.

Over the next six months, the authorities continued to look for other conspirators, especially Conspirator J (against whom the authorities had the most evidence). They made at least three trips to Haiti to follow up on leads. They were able to make some progress in further identifying conspirators. Despite very diligent efforts by law enforcement, however, the efforts did not come to fruition in the form of additional arrests.

As noted above in Section III, Dorvilier was the leader and organizer of the crew of hostage takers. Because of his role, he pleaded guilty to two counts, both count one, hostage taking in violation of §1203, and count two, carrying a weapon in violation of § 924(c), while defendants Jerome Joseph and Fanel Joseph each pleaded guilty to just one count (hostage taking). The plea entered by Dorvilier to a violation of section 924(c) carries a mandatory minimum of seven years (84 months) which must be consecutive to any other sentence imposed. The government is not asking the court to depart from that statutory mandatory minimum. Rather, to permit the sentence of Dorvilier to reflect the full extent of his cooperation and to be equitable in light of the likely sentences that the other defendants will receive, the government respectfully requests that the court depart downward four levels, from level 38 (235-293 months) to level 34 (151-188 months), which with the additional seven years for the 924(c) violation will

result in an aggregate range of 245-272 months ([151-188 months] + 84 months = 245-272 months).  This reduction is substantial, causing Dorvilier's aggregate exposure to fall from 319-377 months down to 245-272 months.

This was a terrible crime for which the victim and his family continue to suffer psychological pain every day.  Dorvilier led this evil scheme.  While the gravity of the offense certainly warrants a long sentence, the government recognizes that Dorvilier entered an early plea and saved the government the considerable resources which would have been involved in a trial of this matter.  Based on its weighing of all the relevant considerations, the United States respectfully submits to the Court that the sentence to be imposed should be in the middle of the new applicable range of 151-188 months plus 84 months mandatory sentence on the 924(c) violation, resulting in an aggregate range of 245-272 months, and the middle being a sentence of between 255-262 months.

## VI.  Motion and Recommendation

Based upon these facts and any additional facts presented at the sentencing hearing, pursuant to U.S.S.G. § 5K1.1, the United States hereby moves for a downward sentencing departure of four levels for defendant Dorvilier from the applicable sentencing guidelines range at level 38 to the range at level 34 (a range of 151-188) months plus 84 months mandatory sentence on the 924(c) violation, resulting in an aggregate range of 245-272 months.  The United States has carefully considered the nature and extent of defendant's assistance and the limitations on it.  The decision to file this motion for departure from the guidelines, represents the assessment by the United States of the overall nature of the assistance which defendant provided.

The government respectfully recommends that the defendant receive a sentence in the middle part of that range, that is a sentence of between 255-262 months.

WHEREFORE, the United States respectfully requests that this Court depart downward, as outlined above, based upon the defendant's substantial assistance to the United States.

                Respectfully submitted,

                JEFFREY A. TAYLOR
                UNITED STATES ATTORNEY
                D.C. BAR NUMBER 498610

                ____/s/_____
                Jeanne M. Hauch
                D.C. Bar Number 426585
                National Security Section
                Assistant United States Attorney
                555 Fourth Street, N.W.
                Washington, D.C. 20530
                (202) 514-5776 telephone
                (202) 307-6059 facsimile
                Jeanne.M.Hauch@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by US Mail on counsel for the defendant:

Joanne Vasco, Esq.
4102 Madison Street
Hyattsville, MD 20781-1754

on this 11th day of January, 2008.

                _____/s/_____
                JEANNE M. HAUCH
                Assistant United States Attorney